# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE V. DWIGHT MILLER

**Appeal from the Circuit Court of Haywood County**
**No. 2401      L. Terry Lafferty, Judge**

---

**No. W2011-00447-CCA-R3-CD  - Filed January 28, 2013**

---

Dwight Miller ("the Defendant") was convicted by a jury of first degree premeditated murder and sentenced to life in prison. The Defendant sought post-conviction relief and, after a hearing, the post-conviction court granted relief in the form of a delayed appeal. We now address two issues in the delayed appeal: (1) whether the trial court erred in refusing to grant a mistrial after a bomb threat; and (2) whether the trial court erred in allowing the prior testimony of an unavailable witness to be read into the record. After a thorough review of the record, we have determined that the Defendant is not entitled to relief on either of these issues. Accordingly, we affirm the Defendant's judgment of conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. THOMAS T. WOODALL, J., filed a dissenting opinion.

William Michael Thorne, Lexington, Tennessee (on appeal); Michael J. Banks, Brownsville, Tennessee (at post-conviction); and Tom Crider, Perianne Houghton, and Diane Blount, Trenton, Tennessee (at trial), for the appellant, Dwight Miller.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Garry Brown, District Attorney General; and Jerald Campbell (at post-conviction) and Larry Hardister (at post-conviction and at trial), Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted in July 1995 on one count of first degree premeditated murder committed in April 1995 in Haywood County, Tennessee. The Defendant initially was tried before a jury in August 1996 and found guilty as charged. On direct appeal, this Court reversed the Defendant's conviction and remanded the matter for a new trial. See State v. Dwight Miller, No. 02C01-9708-CC-00300, 1998 WL 902592, at *1 (Tenn. Crim. App. Dec. 29, 1998) ("Miller I"). The Defendant was tried before a jury a second time in August 2001 and again found guilty as charged. Judgment was entered on August 20, 2001, and the Defendant filed a motion for new trial on September 28, 2001, raising, inter alia, the trial court's refusal to grant a mistrial following a bomb threat and the trial court's admission of the prior testimony of an unavailable witness. After a hearing, the trial court denied the motion for new trial by order filed on November 20, 2001. The Defendant filed a notice of appeal on December 20, 2001. Because the motion for new trial was not filed timely, this Court addressed only the sufficiency of the evidence and affirmed the Defendant's conviction. See State v. Dwight Miller, No. W2001-03095-CCA-R3-CD, 2004 WL 115374, at *1 (Tenn. Crim. App. Jan. 14, 2004) ("Miller II"). The Tennessee Supreme Court denied the Defendant's application for permission to appeal on May 10, 2004. Id.

The Defendant, acting pro se, filed his petition for post-conviction relief on February 22, 2005, alleging that his lawyer ("Trial Counsel") was ineffective in failing to timely file his motion for new trial. At the ensuing hearing, the parties stipulated that Trial Counsel did not timely file a motion for new trial in the Defendant's second trial. Additionally, the Defendant testified as follows:

On the second day of trial, a bomb threat was relayed to the trial judge. The judge ordered one of the sheriff's deputies to take the jury to the train station for safe-keeping. The judge did not give the jurors any instructions. The judge also did not give any of the pending witnesses any instructions. Trial did not resume that day.

Trial resumed the next morning. Juror Westbrook stated that she discussed the "matter" with her grandchildren. Juror Sonya Bell did not return, so the trial judge replaced her with an alternate juror. The Defendant did not think that the alternate juror had been present during all of the previous testimony. Also, George Liggons, one of the Defendant's witnesses, did not return to the trial. When the Defendant requested that a deputy pick the witness up, the judge "said he just didn't have that type of time." Trial Counsel requested that the judge declare a mistrial, but the judge refused.

The Defendant testified that the State requested that Kathy Blackwell's testimony from the first trial be read into the record on the basis that she was unavailable. The trial court granted the State's request.

On cross-examination, the Defendant acknowledged that juror Westbrook told the court that she had discussed the bomb threat with her children. He stated that the bomb threat prejudiced him because the jurors could have held him responsible for it. He also stated that George Liggons had been under subpoena.

After the hearing, the post-conviction court entered a written order granting the Defendant relief in the form of a delayed appeal and staying the post-conviction proceedings. The State does not contest this grant of relief. The Defendant raises two issues for our review: (1) whether the trial court erred in refusing to grant a mistrial after a bomb threat; and (2) whether the trial court erred in admitting the prior recorded testimony of an unavailable witness.

## Analysis

*Mistrial*

We first address the Defendant's contention that the trial court should have granted his motion for a mistrial following the bomb threat at the beginning of his second trial. The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. See Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). "Generally[,] a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The party seeking a mistrial bears the burden of establishing its necessity. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). We will not overturn a trial court's refusal to grant a mistrial absent a clear abuse of discretion. See State v. Hall, 976 S.W.2d 121, app. 147 (Tenn. 1998).

The record of the Defendant's second trial reflects that, during the testimony of the State's first witness, one of the deputies approached the bench and informed the trial court that "[t]here's been a bomb threat to the courthouse." In response to the judge's question about the appropriate response, the deputy stated that "[t]he procedure is to clear the courthouse." The judge told the deputy to "[a]ssign a couple of deputies to take [the jurors] out" and then informed the jury that there was "a probable emergency situation." The court told the jurors that "we'll just leave the courthouse" and that there would be "a couple of

deputies with you all." The judge also told the jury that "we'll come back as soon as they resolve any problems." The court issued no other instructions to the jurors.

The courthouse was evacuated, and court resumed in another location. The trial court then announced the following:

> Approximately halfway through the direct testimony of Billy Blackwell on behalf of the State, the Haywood County Courthouse received an alleged bomb threat. Under the security measures initiated by the Haywood County Sheriff's Department, the Courthouse was evacuated, the jurors were removed in the custody of two Deputy Sheriffs to the other side of the square of the courthouse and to keep them isolated from the public at large, they were taken to the local train station and kept separated. I, as the Judge, requested the presence of the State, Defense Counsel to meet in the office of Mr. Tommy Hooper, the County Attorney, to decide how to handle this matter. It was my decision that we go ahead and authorize the Sheriff to close the courthouse and to secure a bomb dog from Memphis for a total search of the courthouse to insure the safety of all the parties, including the jurors. I requested that the jurors be brought back to Mr. Hooper's office so that I could advise them in the presence of all persons that they would be required to appear back tomorrow at 9:00 a.m. after we have a complete search of the courthouse to insure their safety. I was advised then that we would have the use of the office at the Union Planters Bank Executive Room to confer with the jury. There seemed to have been a miscommunication. Somehow the jury was retained and then released by parties unknown –
>
> CHIEF MARLAR: I plead guilty.
>
> THE COURT: – and ordered to be back at 8:30 in the morning. So that's where we stand. Now, the jury has been separated, you know. Their prior instructions were, you know, at the closing of the opening arguments not to discuss the case with anybody or the testimony. So that's where we stand right now. I'll listen to any motions either of the parties have or anything like that as to a – any type of a motion for mistrial and you're counsel for the defense, [Trial Counsel].

Trial Counsel suggested an individual voir dire the next morning to "make sure that [the jurors] don't have any preconceived notions that maybe [the Defendant] is involved in any way in this episode." She added that she did not know "if that's going to correct the problem or not." The State agreed that individual voir dire was appropriate.

The next morning, the court conducted an individual voir dire of each juror. The court told juror number one that there was "no information or evidence" that the Defendant had been involved in the events leading to the evacuation. The court then asked the juror if his ability to serve on the trial had been affected. Juror number one stated, "It would not affect me at all." The juror also stated that he had heard no allegations or inferences that the trial was the reason for the evacuation. The juror told Trial Counsel that he had not heard or seen news reports "about this." In response to Trial Counsel's question about what the deputies had told the jury the day before, he stated, "I wasn't told anything by the Deputies. I heard maybe one of the fellow jurors say they thought they heard somebody say there was a bomb threat, but the Deputies told us nothing about it. At least, I didn't hear anything about it." Juror number one also assured Trial Counsel that "this event" had not changed his ability to keep an open mind.

The court next spoke with juror number two, informing her that there had been "an alleged bomb threat to the General Sessions Court" and that "it's our information there was no evidence or information that this trial or [the Defendant] had anything to do with the alleged bomb threat." The judge asked the juror if "this" had "any effect" on her "ability to serve for the continuation of the trial," to which the juror responded, "No, sir." The trial court then asked if she had "discussed the proceedings with anybody or among yourselves," and the juror responded, "No, sir." The juror affirmed that she felt safe continuing as a juror and that she had not read or heard anything in the media about the evacuation. She told Trial Counsel that she had not discussed "this" with her friends or family and that she could keep an open mind.

The court next spoke with juror number three, informing him that there had been a bomb threat made to the General Sessions Court and that it had not been made against "this Court or this trial." In response to the court's inquiry as to what effect the evacuation might have had on him, the juror responded, "It didn't have any on me." The court then told the juror that "the best information we have is that [the Defendant] had nothing to do with this" and asked if the juror "can continue on and be a fair and impartial juror?" The juror replied affirmatively. Trial Counsel asked if the bomb threat had made the juror "anxious," and the juror replied, "No." He stated he had not heard or read media accounts about "this." He stated he would keep an open mind and denied that anyone had spoken with him about the trial, other than his wife. He explained, "She said was I going to get on jury duty and I said, 'Yeah.' She said, 'What?' I says, 'It's a murder case.' That's all it was." He affirmed that his wife had no knowledge about the trial.

The trial court informed juror number four that there had been an alleged bomb threat against the General Sessions Court, "not this court or had anything to do with this trial." The trial court inquired whether the event had any effect on the juror's ability to continue as a juror, and the juror responded, "No, sir." The juror denied any opportunity to talk to anyone

about the event and stated that no media report had affected her ability to be a fair and impartial juror. She had no concerns about continuing to serve as a juror. She reiterated to Trial Counsel that she had not been exposed to any media reports and had not spoken to anyone about it. She stated that she was not concerned about the "heightened security," and her opinion about the Defendant and the trial was unaffected.

The trial court similarly informed juror number five, adding, "We have no information or evidence that [the Defendant] was responsible or had anything to do with this alleged bomb threat." When asked if she could "continue on and be a fair and impartial juror," she responded "Yes, sir." She affirmed that she felt "safe and comfortable as a juror." She had not read or heard any media reports about the event. She told Trial Counsel that she had spoken with no one "about this trial" and that no one had spoken to her about it. She affirmed that she had no "hesitancy" or "concern" about continuing to serve and that her opinion of the Defendant had not changed.

The court told juror number six that there had been an alleged bomb threat against the General Sessions Court, and it had nothing to do with the trial. When asked if she could continue to serve as a fair and impartial juror, the juror responded, "Yes, sir." The court then told her that there was no information that the Defendant had been involved and also asked if she had listened or talked to anyone "about what happened yesterday that would affect [her] ability?" The juror responded, "No, sir," and denied that she had read or listened to any media reports. She reiterated this to Trial Counsel and denied that the current security measures caused her concern. She denied that the event had changed her view of the Defendant.

The court similarly informed the next juror and asked if there was any reason she could not continue and be a fair and impartial juror. The juror replied, "No." She denied that she had been exposed to any media accounts of the event and denied that she had spoken to anyone. She added, "I've just heard stuff but I haven't talked." On Trial Counsel's inquiry, she stated that she had heard talk earlier that morning at work about both the Defendant and the bomb threat. She added, "They didn't know nothing about it. It was just talking." She denied that she had learned anything from what she heard about either the trial or the bomb threat. She also denied that the talk indicated that the speakers thought the bomb threat was related to the trial. When asked if the "heightened security" caused her any concern, she replied, "Not yet." She also denied that the event had influenced her opinion about the case.

The trial court similarly informed juror number eight, and she affirmed that she could continue to serve as a fair and impartial juror. She denied having read or listened to any media accounts of the event. She told Trial Counsel she had spoken to no one "regarding this trial or [her] jury service" and that no one had spoken to her. She denied that the heightened

-6-

security caused her any concern. She denied that the event affected her ability to listen to the proof before she made up her mind about the Defendant's guilt or innocence.

The trial court similarly informed juror number nine, and she affirmed that she could continue to serve as a fair and impartial juror and felt safe and comfortable listening to the evidence. She denied having read or listened to any media accounts about the event and denied having discussed it with anyone. She reiterated to Trial Counsel that she had spoken to no one and that no one had spoken to her about the trial or the bomb threat. She stated she was "fine" with the heightened security. She denied that the event had any impact on her "attitude about being seated as a juror" or her "attitude about [the Defendant]."

The trial court similarly informed juror number ten, and she affirmed that she could continue to serve as a fair and impartial juror and felt comfortable with her safety. She stated that she had not seen or heard any media accounts about the bomb threat. She acknowledged that she had discussed the bomb threat with her children, but stated that the discussion had no affect on her ability to serve as a juror. She reiterated to Trial Counsel that she had spoken with her children about the bomb threat and added that she had not spoken to anyone about the trial. She was not concerned about the heightened security. She denied that the bomb threat had affected her opinion about, or ability to judge, the Defendant.

The trial court similarly informed the next juror, and the juror told the court that nothing had happened that would affect her ability to serve as a fair and impartial juror. She had been exposed to no media accounts that affected her. She acknowledged to Trial Counsel that she had been "in a position to talk with" someone about the bomb threat but not the trial. She stated that the person she spoke with about the bomb threat did not indicate or influence her to believe that it was related to the trial or the Defendant. She was not concerned about the heightened security. She stated that the events of the day before had not affected her ability to judge the Defendant fairly.

The trial court similarly informed the next juror and asked him if "anything happened since yesterday afternoon when [he] went home that might have affected [his] ability to serve as a juror in this case and continue on with the trial?" The juror replied, "No, sir." He denied having heard or read any media accounts that affected his ability to serve as a fair and impartial juror. He had not talked to anyone about the trial or the bomb scare. He was not concerned about the heightened security, and the event did not affect his opinion about the Defendant.

A similar colloquy transpired with the final juror. She stated that she heard a mention of the bomb threat on the radio that morning. There was no detailed discussion. She did not speak with anyone about the bomb threat. She stated she could continue in her role as a fair and impartial juror. She told Trial Counsel that, when she got home the day before, "they

was saying it was a bomb, you know – they had a bomb threat at the courthouse and I just kind of like – I just ignored it." She added, "'Cause I . . . didn't want my family to be afraid for me. So I just – some of 'em don't even know I'm on the jury. So, don't anybody know [sic] but my husband and my son." She stated that the heightened security did not concern her. She stated that nothing that had happened the day before changed her ability to listen to all the proof before judging the Defendant and denied that it had "sway[ed] [her] in any way."

Following these conversations with the jurors, Trial Counsel moved for a mistrial "simply for the reason that they were not admonished beforehand as to what to do, how to act, and we believe that that causes such a disruption in the matter that [the Defendant] may not be able to receive a fair trial." The trial court denied the defense motion, ruling as follows:

> They were allowed to go home without further instructions, but that's the reason we conducted the individual voir dire in the absence of each juror [sic] and I'm convinced based on their demeanor and their answers that – frankly, I'm amazed that there hadn't been more discussion about this case in this small county, but they seem in good conscience to want to be fair and impartial jurors and they say it has no effects on 'em so I see no manifest necessity to declare a mistrial and it's denied.

In his brief before this Court, the Defendant argues that the dismissal of the jury "during a threat of serious harm . . . is enough to consider that the jurors were tainted and potentially unwilling to return and pay real attention to the facts and evidence presented at trial." He continues: "It is understandable that a reasonable juror would have concerns for their own safety in a building that had been threatened by a bomb and would have difficulty in continuing to serve with a clear mind." Thus, he argues, the trial court abused its discretion in denying his motion for a mistrial.

We disagree. Initially, we recognize that it would have been preferable for the trial court to have had an opportunity to admonish the jury prior to its being separated and the jurors allowed to return to their homes. However, we note that the record reflects that the trial court had already admonished the jurors at least three times that they were not to discuss the case amongst themselves or with anyone else: First, after the indictment was read and the Defendant pleaded not guilty; second, prior to the jury being released for lunch a short time later; and third, at the close of opening statements, when the trial court instructed the jury, "Now, as you listen to the testimony unfold here in the courtroom, you cannot discuss that testimony among yourselves or with anyone until you've heard all the evidence and the testimony, the final arguments, the charge of law and permission to deliberate." Moreover, each of the jurors indicated during individual voir dire that they had not discussed the case

with anyone after they were evacuated from the courthouse. The record reflects that none of the jurors was tainted by any outside influence during the separation and that the jurors did not discuss the case amongst themselves after they were evacuated. Accordingly, the trial court did not abuse its discretion in denying a mistrial on this basis. See United States v. Arciniega, 574 F.2d 931, 933 n.4 (7th Cir. 1978) (trial court did not abuse its discretion in allowing jury to separate during deliberations because of bomb threat, and deputy marshall's failure to admonish jury pursuant to trial court's instructions did not create reversible error "in the absence of some showing by the defendant of [resulting] prejudice" and where trial court previously had admonished jury twice not to discuss case with anyone).

We also hold that the bomb threat did not, in and of itself, so taint the jury as to create a manifest necessity for the declaration of a mistrial. See, e.g., Taylor v. State, 799 S.W.2d 519, 523 (Ark. 1990) (trial court did not err in denying mistrial after bomb threat during first day of trial because trial court informed jurors that threat was unrelated to case and questioned jurors to ensure no prejudice arose from exposure to erroneous media account attributing threat to defendant; defendant demonstrated no prejudice); United States v. Robotham, No. 90-5786, 1991 WL 62463, at *2 (4th Cir. Apr. 25, 1991) (trial court did not abuse its discretion in denying mistrial after bomb threat during trial required evacuation of jurors because trial court told jury that threat had nothing to do with case, noting that defendant "made no showing below that any prejudice arose from the incident" and noting "that it would be a bad practice to posit a new rule that would require a mistrial as a matter of course in such instances"). See also Arciniega, 574 F.2d at 932-33 (no error following separation of jury during deliberations because of bomb threat where trial court explained situation to jurors next morning and questioned jurors to establish that they had not discussed case with anyone after separation); State v. Young, 866 S.W.2d 194, 195-97 (Tenn. Crim. App. 1992) (affirming trial court's denial of new trial where jurors learned of bomb threats made during trial, recognizing that "the trial judge was in the best position to assess the nature of the extraneous information, as well as its effect, if any, upon the jury"). Nor does the record reflect that a miscarriage of justice would result upon the continuation of the trial after the bomb threat. Rather, the record demonstrates that the trial court carefully questioned each juror to ensure that the bomb threat had had no impact on each juror's ability to continue to serve as a fair and impartial juror. Trial Counsel also was allowed to question each individual juror. The jurors' responses to these questions establish that each one had remained untainted by outside information or influence; each one remained committed to serving as a fair and impartial juror; none had allowed the bomb threat to influence their opinion about the Defendant; and none was distracted or concerned about the heightened security measures. In short, the record supports the trial court's decision to deny the Defendant's request for a mistrial. The Defendant is entitled to no relief on the basis of this issue.

The Defendant also takes issue with the trial court's admission of State witness Katherine Blackwell's prior testimony. After the jury was sworn but prior to any witness testifying, the trial court held a jury-out hearing regarding the State's assertion that Blackwell was unavailable to testify in person. After the hearing, the trial court concluded that Blackwell was unavailable and that the State would be allowed to read into the record portions of her testimony from the Defendant's first trial. See Tenn. R. Evid. 804(a)(5), (b)(1).[1] The Defendant contends that Blackwell's testimony from his first trial should not have been admitted in his second trial because it was "tainted" and prejudicial. The Defendant points out that this Court reversed the verdict of his first trial because of Blackwell's testimony, see Miller I, 1998 WL 902592, at *10-13, and argues that the readmission of it should again result in a reversal. The State disagrees, contending that the problems with Blackwell's testimony during the first trial were cured in the second.

To assist in our resolution of this issue, we repeat here our summary of the facts set forth in the initial direct appeal from the Defendant's second trial:

In the early morning hours of April 20, 1995, the [Defendant] and Donald Rice were sitting in their cars, which were parked driver's window to driver's window, outside a housing project in Brownsville, Tennessee. Both vehicles were burgundy or maroon with four doors. Clement Harris, who was sitting outside the housing project at the time, heard the [Defendant] and Mr. Rice talking. Mr. Harris knew the [Defendant] from school and was able to recognize his voice when he heard him speak with Mr. Rice. After the conversation ended, Mr. Harris saw Mr. Rice begin to back his car away from the area. As Mr. Rice backed up, a gun was fired from the [Defendant's] car, fatally shooting Mr. Rice in the face. After the shooting, the [Defendant] got out of his car, got into Mr. Rice's car, pushed Mr. Rice over, and drove Mr. Rice's car away. A passenger in the [Defendant's] car slid over to the driver's seat and followed the [Defendant]. Mr. Rice's body was subsequently discovered in a ditch, and his abandoned car was later found by the police.

---

[1] Tennessee Rule of Evidence 804(a)(5) provides that a witness may be deemed "unavailable" where he or she "[i]s absent from the hearing and the proponent of a statement has been unable to procure the [witness'] attendance by process[.]" Tennessee Rule of Evidence 804(b) provides that a witness' former testimony is not excluded by the rule against hearsay if the witness is "unavailable" at the current proceeding. "Former testimony" is defined as "[t]estimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1).

On the day prior to the murder, Nina Champion, an acquaintance of the [Defendant], saw shotgun shells in the backseat of the [Defendant's] car and a shotgun in the trunk of his car. Officer Johnny Blackburn of the Brownsville Police Department testified that he searched the [Defendant's] bedroom after the murder and found a shotgun that smelled of gunpowder as well as a live, red 12-gauge shotgun shell on a night table, and a spent, red 12-gauge shotgun shell in a shoe under the table. The shells were of the same type and size shot found in the body of Mr. Rice.

The medical examiner testified that Mr. Rice died as a result of a shotgun wound to the head.

Miller II, 2004 WL 115374, at *1-2 (footnote omitted). Because this summary includes no reference to Blackwell's testimony, we have reviewed the transcript of the Defendant's second trial and now summarize those portions of Blackwell's previous testimony that were read into the record:

Blackwell acknowledged that she had been staying with "Sheila" in the spring of 1995. When asked if she knew the Defendant, she stated that she did not and that she did not remember his face. When asked if she knew or had ever known "anybody named Dwight Miller?," she replied, "I've seen one called Scarecrow." She stated that the Defendant did not look like Scarecrow, but added that it had been so long ago that she just did not remember. She also denied knowing the victim. She acknowledged that she knew Brownsville Police Department Investigator Johnny Blackburn and acknowledged that the Tennessee Bureau of Investigation ("TBI") had questioned her. She gave a statement but did not remember if her statement was true. She added that, if she gave her statement under oath, it was true. She explained, "I just don't remember that. I've been on a lot of medication. I don't remember that long ago."

Blackwell denied being frightened and denied being threatened. When asked by the prosecutor why she was "refusing to testify," she replied, "Because I don't remember." The prosecutor then handed Blackwell the sworn statement she had given to the TBI. Blackwell read it and then stated that she did not remember its contents. She then denied ever having bought cocaine from "this man" and denied that he ever had given her cocaine. She stated that she saw him one time only "[a]t Sheila's house." She then clarified that she did not actually see him but heard him. Sheila told her later that the man she heard was Scarecrow.

At the prosecutor's request, the (first) trial court declared Blackwell a hostile witness and allowed the prosecutor to proceed with leading questions. The prosecutor then asked Blackwell a series of specific questions about the statement she gave to the TBI, including her declarations that, on the morning the victim was murdered, she was staying at Sheila's

house; that sometime after 2:00 that morning, there was "a rapping at the door" and that she got up "because Scarecrow was at the door and he was angry"; that there was another man with Scarecrow and that Scarecrow was wearing a bandana; that she later left to go buy some cocaine; that she saw Scarecrow again "in a dark, rust colored, four-door car with a drive-out tag in the rear window on the right"; that she had seen the victim driving a car "just like the one the [Defendant] was driving"; that Scarecrow approached her, took the $35 that was in her hand, and started cursing her; and that Scarecrow was acting weird and said that the victim was dead and that he was found on Fairgrounds. Blackwell testified that she did not remember making any of these statements.

On cross-examination, Blackwell explained her memory loss: "I used to smoke a lot of crack and it burns your brain up. You don't remember anything." She stated that she "used to have a bad habit" but that she was now "a recovering addict." She acknowledged having spoken with an investigator who worked with the defense but stated that she did not remember what they talked about.

On redirect examination, Blackwell stated that she did not know the Defendant "very well at all" and denied that she had a relationship with him. She testified, "He was just wanting to get into Sheila's house," but stated that she did not know why. She added that she had bought cocaine from him on the street later that morning.

On further cross-examination, Blackwell clarified that, on the night in question, she heard arguing and walked out of the bedroom to see about it. Sheila was there, and she also saw Scarecrow. She testified, "I saw him." She thought this occurred at about 2:00 in the morning. She stated that Sheila would not let Scarecrow in and that he and the person he was with then left. She did not know who the other person was. Later, Scarecrow asked her, "Did you hear about [the victim]? He's dead. He's dead." She went back home after she bought the cocaine.

On further examination by the prosecution, she acknowledged having given two statements to the TBI, one that was "fairly long" and one that was "shorter." When asked about the shorter statement, she testified, "Sheila and I had gone over to Fairgrounds to buy crack and we saw [the victim] and Scarecrow together. That's who she bought it from." She did not remember if Sheila purchased the cocaine from the victim or Scarecrow. She acknowledged that this occurred around 1:00 a.m. on the night that the victim was killed. She and Sheila returned to Sheila's house. She went to bed. She testified that she did not "do" the cocaine because it was not hers. It was about 2:00 or 2:30 when Scarecrow came over. After he left, she returned to bed. Sheila sent her "over there" a little before 11:00 that morning. She then saw Scarecrow driving "like an older model Chevrolet like a maroon with a tan top."

-12-

On further cross-examination by the defense, she stated that she did not remember seeing Clement Harris when she went out "that night." She went to Fairgrounds. She reiterated that it was 1:00 when they got back to the house. She did not know how long the arguing had gone on before she woke up.

The Defendant argues that, "[b]ecause this Court reversed the first conviction based on the inappropriate introduction of the testimony of Ms. Blackwell, the trial court should not have allowed the testimony during the second trial. The testimony was still prejudicial to [him] and should result in a reversal of this conviction."

As set forth in <u>Miller I</u>, the trial court in the first trial committed reversible error as follows:

Katherine Blackwell . . . testified . . . as a state's witness. She essentially claimed total memory loss of pertinent events as she had previously described in statements given to the T.B.I. and a defense investigator. The court allowed the prosecution to treat Blackwell as a hostile witness. After Blackwell completed her testimony, the court had the jury removed from the courtroom, then *sua sponte* advised Blackwell,

> I'm going to let you go into the custody of the Sheriff and see if your memory gets any better. For purposes of this record, I don't find the fact that you say you don't remember to be credible. . . . And so, you go with the Sheriff, and when you feel like that you can remember and you can come back in here and testify truthfully before this jury, you can let me know. Until then you can remain in the custody of the Sheriff.

Thereafter, Special Agent Bryan Byrd testified for the state. During the course of his investigation, he took two signed statements from Blackwell. He read both of these statements to the jury. In them, Blackwell claimed that she saw the defendant and the victim together around 1:00 on the morning of the murder at the location where the murder later took place. Around 2:00 that morning, the defendant and another man came to the house where Blackwell and Sheila Bernil were living. The defendant was angry. Several hours later, Blackwell went to buy crack cocaine from the defendant. He was driving a car like one she had previously seen the victim driving. The defendant told her that the victim was dead.

After the state rested, the court allowed the state to reopen its proof, and the court called Blackwell as its own witness. The court explained to the jury,

"I'm calling her as my own witness. Neither side will have to vouch for her credibility, but I asked her to take her statements and go back and – and try to remember what happened and see if her memory improved any." He then addressed the witness, "Now, what I want you to do is I want you to tell these ladies and gentlemen in your own words what happened that night, and . . . I want you to tell them the truth, whatever that is . . . ." Blackwell then proceeded to testify in accord with her previous statements. She said her memory had improved in the hours since her first appearance on the witness stand because she did not want to go to jail. Blackwell also testified that she had been beaten by three unknown assailants shortly after she talked to the T.B.I. She said she did not know why the beating occurred, but she could think of no reason other than her involvement in this case. She admitted, however, that she had not received any threats relative to this case.

Miller I, 1998 WL 902592, at *10-11.

In reversing the Defendant's initial conviction on the basis of Blackwood's testimony, this Court held as follows:

[T]he trial court's unusual procedure influenced the witness's testimony to the defendant's detriment. The trial court told the witness, "Until [you can testify truthfully], you can remain in the custody of the sheriff." Later, during her second visit to the witness stand, the witness testified her memory had improved in the last few hours "[b]ecause I didn't want to go to jail." Furthermore, the witness's testimony once she abandoned her claim of memory loss was probative of the defendant's guilt. Her testimony placed the defendant with the victim around 1:00 a.m. on the night of the murder. About an hour later, the defendant and another man came to the house where the witness was living and argued with the witness's roommate about whether the men could come inside. This evidence is significant because it is contrary to the defendant's statement to the police th[at] he was not in Brownsville on the night of the murder. Blackwell also testified that she saw the defendant several hours later, and he told her about the victim's death. This was prior to the discovery of the victim's body. Further, the witness testified she had been assaulted after talking to the T.B.I. and offered the possibility of a causal connection between the two events. Clearly, the trial court's actions influenced testimony which was damaging to the defense. We are constrained to find abuse of discretion in the actions of the trial court.

Moreover, we believe this error mandates reversal. First, the trial court's actions resulted in serious prejudice to the defendant. When Blackwell

-14-

returned to the witness stand, her testimony was not merely duplicative of evidence already before the jury via Special Agent Byrd. Rather, she made an additional extremely damaging claim that she had been assaulted and that the assault might be attributable to the defendant. Moreover, her initial reluctance to testify which was overcome only by the prospect of incarceration was played out before the jury. Unquestionably in these circumstances the testimony upon the witness's second trip to the stand suggests that she had been previously coerced not to testify against the defendant. Second, the entire procedure was prejudicial to the judicial process.

Miller I, 1998 WL 902592, at *12 (citations and footnotes omitted).

Taking these concerns into account, the trial court in the Defendant's second trial ruled that the State could read into the record only certain portions of Blackwell's prior testimony. The trial court identified the admissible portions by volume, page, and line numbers, referring to the transcript of the Defendant's first trial. That transcript is not in the record before us. However, the portions that were read into the record do not include the first trial court's admonitions to Blackwell; any indication that her testimony was presented at two distinct times; Blackwell's explanation that her memory had improved since her first appearance on the stand because she did not want to go to jail; or her testimony about being beaten and her thought that the beating was related to the case. Additionally, the second trial court ruled that "the state will not be permitted to call Sp. Agt. Bryan Byrd for the sole purpose to read the out of court statements of Katherine Blackwell to the jury." In sum, the trial court "purged" Blackwell's former testimony of the reversible errors identified by this Court in its opinion dealing with the direct appeal from the Defendant's first trial.

As pointed out by the State in its brief, an unavailable witness' prior testimony may be admissible at a subsequent trial if the defendant had the opportunity and a similar motive to develop the testimony via methods such as cross-examination. See Tenn. R. Evid. 804(b)(1). The Defendant's constitutional right of confrontation was not violated at his second trial because, after a hearing at the beginning of the second trial, the court determined that Blackwell was unavailable, and the Defendant had a prior opportunity to cross-examine her. See State v. Cannon, 254 S.W.3d 287, 303 (Tenn. 2008). Indeed, the Defendant does not challenge on appeal the admission of Blackwell's prior testimony on confrontation grounds. Rather, the Defendant contends that the reversible taint surrounding Blackwell's prior testimony persisted and that her testimony was unfairly prejudicial.

We disagree. In general, this Court will not overturn a trial court's decision regarding the admissibility of evidence absent an abuse of discretion. See State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008); State v. Looper, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003). We discern no such abuse here. The trial court carefully analyzed the problems surrounding

Blackwell's initial testimony and excised those portions which this Court determined were unfairly prejudicial to the Defendant in his first trial. We acknowledge this Court's prior observation that the first trial court's handling of Blackwell "influenced [her] testimony to the defendant's detriment." Miller I, 1998 WL 902592, at *12. However, it is clear that this Court reversed the Defendant's first conviction, not because of Blackwell's testimony about seeing and speaking with the Defendant, but because of the manner in which the trial court admonished Blackwell in front of the jury, her explanation that her improved memory resulted from the threat of jail, and her testimony that she had been assaulted after she spoke with the TBI together with her attribution of the assault to her involvement with the case. In the Defendant's second trial, the jury was not exposed to these reversible errors. Therefore, in our view, the trial court's handling of this matter fell within its discretion regarding the admissibility of evidence. The admission of Blackwell's previous testimony, as redacted by the trial court, did not unfairly prejudice the Defendant. Accordingly, the Defendant is entitled to no relief on this issue.

## Conclusion

The Defendant is entitled to no relief from his conviction of first degree murder on the basis of the trial court's refusal to grant a mistrial or on the basis of the trial court's admission of Blackwell's prior testimony. Accordingly, we affirm the Defendant's judgment of conviction.

_____
JEFFREY S. BIVINS, JUDGE